FEDERAL ADVERTISING AGENCY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 9835, 11512, 12957, 19391, 21196.   Promulgated May 26, 1930.

*Mark Eisner, Esq., Milton Dammann, Esq.,* and *Ferdinand Tannenbaum, Esq.,* for the petitioner.

*J. Arthur Adams, Esq.,* for the respondent.

1134

OPINION.

ARUNDELL: The respondent in denying personal service classification contends that the petitioner fails to meet two of the statutory tests. First, that the principal stockholders were not regularly engaged in the active conduct of the affairs of petitioner, and second, that petitioner's income can not be ascribed primarily to the activities of the principal stockholders.

The first contention is based on the record stockholdings of Isabel M. Kaufman. In the year 1918 Mrs. Kaufman was not a stockholder of record, and the evidence shows that all the record stockholders were engaged in the active conduct of petitioner's affairs. Joseph Kaufman, while not exclusively engaged in working for petitioner, was one of its account executives and his activities bring him within the definitions of being " regularly" engaged in petitioner's service. *Lee Live Stock Commission Co.*, 7 B. T. A. 532; *Weill-Jamison Co.*, 13 B. T. A. 1342. Isabel M. Kaufman can not be regarded as a stockholder in 1918 for whatever interest she ultimately held in petitioner's stock was a gift from Carl Kaufman and the gift had not been completed in 1918.

At the beginning of 1919 Joseph Kaufman had withdrawn from active participation in petitioner's business, his stock was acquired by Carl Kaufman who caused it, together with his other stockholdings, to be registered in the name of his wife. Mrs. Kaufman indorsed the certificates in blank and delivered them to her husband, who thereafter had custody of them. When the stock was increased in the latter part of 1919 Mrs. Kaufman became the record holder of a proportionately larger amount of stock, which likewise was held by her husband after indorsement in blank. The evidence establishes clearly that the stock was put in Mrs. Kaufman's name only as a matter of protection to her, prompted by the ill health of her husband, and that it was never intended that she should be the legal owner of more than one-half of it. In our opinion it must be held that Mrs. Kaufman owned no more than one-half of the 231 shares in her name from January 1 to October 1, 1919, and of the 1,351 shares thereafter. Cf. *T. D. Downing Co.*, 2 B. T. A. 469; *C. J. Swift Co.*, 12 B. T. A. 974. On a percentage basis then, Mrs. Kaufman from January 1 to October 1, 1919, owned 23 per cent; from October 1 to December 31, 1919, 21.3 per cent; and in 1920 and 1921, 18.7 per cent. The owners of the remainder of the stock were all actively engaged in the petitioner's affairs and in our opinion the ownership of the above percentages by Mrs. Kaufman is not in itself sufficient to defeat personal service. See *McMartin Advertising Agency*, 11 B. T. A. 162. We think it proper in this connection to bear in mind that Mrs. Kaufman was at least to some extent

1136

active in petitioner's affairs. She not only discussed with her husband his problems and those of other stockholders, but went out of her home and into the markets to secure information and advertising ideas which were of value to the petitioner.

Respondent's second reason for denying personal service classification is based on the contention that a substantial part of petitioner's income was derived from the activities of solicitors who were not stockholders.

In the schedules set forth in the findings of fact a part of petitioner's income in 1919 and 1920 is shown as attributed by it to Mahin, Short, Woods, and Richland, none of whom were stockholders in 1919. A part is also attributed to Joseph Kaufman in 1919, but this is explained as arising out of accounts he had secured before he gave up his stock holdings. In 1920 Woods and Richland had become stockholders. In addition to these, it would appear from the facts that Geisinger and Bennett were paid commissions that some business was attributable to their efforts. However, it is clearly shown by the evidence that the nonstockholding solicitors never closed accounts with advertisers, but that this important function was always performed by a principal stockholder. When an account was obtained the details necessary to execute it were handled by petitioner's organization under the very close supervision of petitioner's principal stockholders. It was, as we said in *Botsford-Constantine & Tyler*, 10 B. T. A. 565, to the principal stockholders that advertisers looked for service and not to solicitors or employees. See *Potts-Turnbull Advertising Co.* v. *United States*, 68 Ct. Cls. 703. The organizers of petitioner, who were also its principal stockholders, were all experienced advertising men and it was due to their ability to satisfactorily execute accounts that petitioner's income was primarily attributable. The principal stockholders could have conducted an agency without the aid of solicitors, but the solicitors could not have carried on an advertising business without the skilled supervision of the principal stockholders.

It is evident from the facts that capital was not a material income-producing factor. No capital was originally paid in to petitioner and such as it subsequently acquired was not necessary for successful operation, because of petitioner's practice of obtaining payment of its receivables before the due date of its payables. It was only in rare cases that payment was made to a publisher before receipt from the advertisers. Accounts and notes receivable and trade acceptances were offset by accounts payable to an extent to make it plain that they played no material part in producing income. For 1918 receivables amounted to $19,492.53 more than the payables and gross income was $236,949.85. For 1919 receivables exceeded payables by

$57,799.57 and gross income amounted to $580,595.36. For 1920 the excess was $62,331.01 and gross income was $815,435.42. For 1921 the excess of receivables over payables was $29,582.45 and gross income was $571,198.78. See *S. A. Conover,* 6 B. T. A. 679; *Botsford-Constantine & Tyler,* 10 B. T. A. 565; *Snitzler-Warner Co.,* 16 B. T. A. 342. The excess of discounts earned over those allowed did not arise out of the use of capital, but represented discounts on such work as engraving and electrotyping costs which were not passed along to clients.

Petitioner has met all the statutory tests for personal service classification and in our opinion the respondent erred in failing to so classify it. This conclusion makes it unnecessary to pass on the salary issue for 1918.

Reviewed by the Board.

*Decision will be entered for the petitioner.*